

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-15-00221-CV

IN THE MATTER OF M.R.

----------

FROM THE PROBATE COURT OF DENTON COUNTY
TRIAL COURT NO. MH-2015-160

----------

## MEMORANDUM OPINION[1]

----------

Appellant M.R. appeals from a judgment for court-ordered extended inpatient mental health services. *See* Tex. Health & Safety Code Ann. § 574.035(a) (West Supp. 2014). In three issues, M.R. argues that the rules of evidence conflict with the statutory requirements for court-ordered extended inpatient mental health services, denying M.R. due process, due course of law,

---

[1]*See* Tex. R. App. P. 47.4.

and effective assistance of counsel; that the trial court abused its discretion by improperly admitting M.R.'s medical records into evidence; and that the evidence was legally insufficient to support the jury's findings that M.R. (1) was suffering severe and abnormal mental, emotional, or physical distress, (2) was experiencing substantial mental or physical deterioration of his ability to function independently as exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and (3) was unable to make a rational and informed decision as to whether or not to submit to treatment. We affirm.

## Background

### *The application for temporary mental health services*

M.R. is twenty years old and suffers from schizoaffective disorder. On March 26, 2015, a peace officer with the Denton County Sheriff's Office, believing M.R. was mentally ill, took him into custody without a warrant and transported him to Mayhill Hospital in Denton, Texas. *See id.* §§ 573.001–.026 (West 2010 & Supp. 2014) (providing procedures for emergency detention for cases of suspected mental illness). In his notification of detention, the officer stated that he believed that M.R. was mentally ill and that M.R. evidenced a substantial risk of serious harm to himself or others because he was disoriented; was responding to visual and auditory hallucinations; responded to the officer's questions with grunting noises; and reportedly had not been bathing, had been soiling himself regularly, had been walking around making growling noises and

2

talking to people who were not there, and had not taken his medication in two weeks. *See id.* § 573.002.

On March 27, 2015, Tiffany Castro, LPC, a mental health professional at Mayhill Hospital, filed a sworn application for temporary mental health services, which was approved for filing by the State, alleging that M.R. was mentally ill and that as a result of that mental illness, he (1) was likely to cause serious harm to himself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by M.R.'s inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* §§ 574.001, .002, .034(a) (West Supp. 2014). According to Castro's affidavit filed in support of the application, M.R. had received psychiatric care at Mayhill Hospital in 2014 and at a state hospital in 2015 and was a substantial risk of serious harm to himself or others because he was paranoid, psychotic, disoriented, and not taking care of his daily needs. She also stated that M.R. went "from not responding to yelling and jumping around and responding to internal stimuli."

Also on March 27, 2015, Dr. Asad Islam, M.D. filed a sworn certificate of medical examination for mental illness. *See id.* §§ 574.009, .011 (West 2010). Dr. Islam averred that he examined M.R. on March 26, 2015, at Mayhill Hospital

3

and diagnosed him with schizophrenia. Dr. Islam believed that as a result of his illness, M.R. (1) was likely to cause serious harm to himself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by M.R.'s inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.011(a)(7). Dr. Islam provided the following as the basis for his opinion: "The patient is responding to visual and auditory hallucinations and has been regularly soiling himself. The patient is disoriented and psychotic." In the physician's affidavit attached to the certificate of medical examination for mental illness, Dr. Islam elaborated on the basis for his opinions expressed in the certificate. In addition to regularly soiling himself and experiencing visual and auditory hallucinations, M.R. refused to answer questions, had reportedly not taken his medication in two weeks, had been walking around making growling noises and talking to people who were not present, had been yelling and jumping up and down, had been aggressive and saying sexually inappropriate things to people, was unable to make a rational and informed decision to submit for treatment, and was unable to effectively and voluntarily participate in outpatient treatment. Dr. Islam recommended inpatient hospitalization.

4

The State filed a motion for an order of protective custody of M.R. pending resolution of the case, and the trial court granted it. *See id.* § 574.021 (West 2010). The trial court appointed counsel to represent M.R., set dates for a probable cause hearing and the hearing on the application for temporary mental health services, and issued notice to M.R. *See id.* §§ 574.003, .005–.006, .025 (West 2010). M.R. waived his right to appear and present evidence at the probable cause hearing. At the probable cause hearing, the trial court determined that there was probable cause to believe that M.R. presented a substantial risk of serious harm to himself such that he could not be at liberty pending the final hearing on the application and ordered that he be transported to and detained at the North Texas State Hospital (NTSH). *See id.* § 574.025.

M.R. executed and filed a waiver of his right to be present at the hearing on the application that also authorized the trial court to make findings based upon the certificates of medical examination for mental illness on file. *See id.* §§ 574.031(c) (West 2010), 574.034(f) (West Supp. 2014). M.R. and his attorney executed and filed a waiver of M.R.'s right to cross-examine witnesses at the hearing and of evidence of a recent overt act or continuing pattern of behavior tending to confirm the likelihood of serious harm to others or to M.R. or his distress and deterioration of his ability to function. *See id.* § 574.034(d) (West Supp. 2014), (f).

5

On April 9, 2015, based on Dr. Islam's and Dr. Diana Isachievici's certificates of medical examination for mental illness,[2] the trial court found that M.R. was mentally ill and that as a result of his mental illness, M.R. (1) was likely to cause serious harm to himself, (2) was likely to cause serious harm to others, and (3) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.034(a). The trial court granted the application and ordered M.R. committed to NTSH for a period not to exceed ninety days. *See id.* § 574.034(g) (West Supp. 2014).

***The application for extended mental health services***

On June 11, 2015, Kimeshia Lloyd, a social worker at NTSH, filed a sworn application for extended mental health services, which was approved for filing by the State, alleging that M.R. was mentally ill and that as a result of his mental illness, he (1) was likely to cause serious harm to himself and (2) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by M.R.'s inability, except for reasons of

---

[2]Dr. Isachievici's certificate is not in the appellate record.

indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* §§ 574.001, .002, 574.035(a). Lloyd also alleged that M.R.'s condition was expected to continue for more than ninety days and that M.R. had received court-ordered inpatient mental health services under health and safety code section 574.034 for at least sixty days during the preceding twelve months. *See id.* § 574.035(a).

Also on June 11, 2015, Dr. Zahida Syed, M.D. filed a sworn certificate of medical examination for mental illness. *See id.* §§ 574.009, .011. Dr. Syed averred that she examined M.R. on June 5, 2015, at NTSH and diagnosed him with schizoaffective disorder. She also noted that he was not complying with his treatment. Dr. Syed believed that as a result of his illness, M.R. (1) was likely to cause serious harm to himself and (2) was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by M.R.'s inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.011(a)(7). It was also her opinion that M.R. had an inability to participate in outpatient treatment services effectively and voluntarily and that his condition was expected to continue for more than ninety days. *See id.* § 574.011(c). Dr. Syed based her opinion on M.R.'s severe psychosis and

bizarre behavior with increased agitation and his yelling, chanting, and howling in response to internal stimuli. She noted that he suffered from severe distress during these episodes. She also noted that M.R. refused to take showers; wore layers of clothing in hot weather; was socially isolated and restless; had a history of not complying with his treatment; had limited insight and judgment; and was not able to take care of himself. She recommended extended commitment to NTSH "[a]s he was hospitalized within a few weeks after previous discharge and still has not improved significantly after three months of inpatient treatment."

On June 15, 2015, the trial court appointed M.R.'s current counsel to represent him. *See id.* § 574.003. The order appointing counsel ordered that M.R.'s counsel be furnished with all records and papers in the case and have access to all of M.R.'s records from TDMHMR and Denton County MHMR concerning prior and present treatment, recommendations, and services provided to M.R. *See id.* § 574.003(c). M.R. requested a jury trial.

On June 22, 2015, Dr. James G. Shupe, M.D. filed a sworn certificate of medical examination for mental illness. *See id.* §§ 574.009, .011. Dr. Shupe stated that he examined M.R. on June 22, 2015, at the Denton County Probate Court and diagnosed him with schizoaffective disorder. Dr. Shupe believed that as a result of his illness, M.R. was suffering from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by M.R's inability, except for reasons of indigence, to provide for his basic needs,

8

including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.011(a)(7). It was also his opinion that M.R. had an inability to participate in outpatient treatment services effectively and voluntarily and that his condition was expected to continue for more than ninety days. *See id.* § 574.011(c). His opinion was based on the fact that M.R. remained "very psychotic" despite three months of treatment at NTSH, appeared to be having hallucinations, and still believed he was not mentally ill and did not need medication. Dr. Shupe also recommended court-ordered inpatient treatment.

### *The trial and judgment*

The application for extended mental health services was tried to a jury on July 6, 2015. When the State offered 549 pages of M.R.'s medical records, M.R. objected to them as hearsay and on the grounds that the State failed to comply with rule of evidence 902(10)(A) because it did not serve the medical records on M.R. fourteen days before the trial. *See* Tex. R. Evid. 801, 802, 803(6), 902(10)(A). The trial court overruled M.R.'s objections and admitted the records into evidence.

Dr. Syed, an expert in forensic psychiatry and a staff psychiatrist at NTSH, testified that M.R. was admitted to NTSH on March 27, 2015, and that she had been his treating physician for the last month. She diagnosed M.R. with schizoaffective disorder and stated that M.R. suffered from schizophrenia and a mood disorder. Dr. Syed further testified that M.R.'s schizophrenia presented

9

with hallucinations, delusions, and thought disorder; M.R. also had disorganized thought processes and a history of becoming aggressive when responding to internal stimuli.

Dr. Syed last met with M.R. the morning of trial. While he was "dramatically more goal directed," he was mumbling and responding to internal stimuli. M.R. had improved after he was transferred into Dr. Syed's care in June 2015 and after she changed his medications. Even though M.R. was more goal directed and his thoughts were more organized, he still suffered from hallucinations, to which he would respond. M.R.'s insight and judgment were still impaired, and he believed that he had killed himself. M.R. did not believe that he had any mental illness and was ambivalent about whether he needed medication. M.R. required prompts to shower because he would go three or four days without showering.

Dr. Syed testified that M.R. had no insight into his mental illness and did not think he needed medication. She was concerned that M.R. would stop taking his medication—which he needed to function—if he were released from treatment. Approximately two weeks after M.R. was discharged from inpatient treatment into his parents' care in March 2015, he stopped taking his medication. He wandered away from his parents' house and was found two days later in a park, psychotic, exhibiting bizarre behavior, and responding to internal stimuli. M.R. had also defecated on himself. According to Dr. Syed, M.R.'s poor insight into his illness caused him to stop taking his medication, which caused his

10

condition to deteriorate. M.R. was readmitted to inpatient treatment after this incident.

Dr. Syed testified M.R. was an indirect danger to himself because he was unable to take care of himself; he did not, however, have suicidal thoughts. But he did have a history of physical aggression towards others. Dr. Syed stated that M.R. recently had a verbal altercation with another patient, and on two occasions in April 2015, M.R. had to be physically restrained because he was physically aggressive towards NTSH staff and was unable to be verbally redirected. Based on M.R.'s history of physical aggression towards others, Dr. Syed was concerned that he could be a danger to others.

Dr. Syed testified that M.R. had a continuing pattern of behavior of not dealing with his mental illness, was suffering severe and abnormal distress, and was experiencing a deterioration of his ability to function independently. She further opined that he could not provide for his basic needs and was unable to make a rational decision as to whether to submit to treatment. She stated that he had received court-ordered inpatient mental health services for at least sixty days in the last twelve months. In her opinion, outpatient treatment was not an option for M.R. at the time of trial because he had poor insight into his mental illness and his need for medication.

Dr. Syed recommended inpatient treatment for M.R. She changed M.R.'s medication the week prior to trial. M.R.'s condition improved on the new medication, but the medication would take four to six weeks to show full benefit.

11

Inpatient treatment was the least restrictive treatment that she expected to be effective.

On cross-examination, Dr. Syed conceded that even though she testified that M.R. was suffering substantial mental or physical deterioration of his ability to function independently because he was not able to take care of himself, his overall health was fine. M.R. required prompting to change his clothes and to eat, but he was able to clothe and feed himself without assistance. M.R. was not emaciated.

Dr. Shupe, who is also an expert in forensic psychiatry, testified that he first saw M.R. two weeks prior to trial and last saw him the morning of trial. Dr. Shupe further testified that M.R. continued to walk, pace, talk, and laugh for no apparent reason, which was consistent behavior for a person who is psychotic. M.R. admitted to Dr. Shupe that he heard voices. Dr. Shupe did not observe M.R. talking to people who were not there, but he believed M.R. was having hallucinations because M.R. told him he was hearing voices of people he could not see.

Dr. Shupe diagnosed M.R. with schizoaffective disorder. Dr. Shupe based his diagnosis on M.R.'s psychosis, mood swings, and mood instability. According to Dr. Shupe, schizoaffective disorder is "kind of a combination of bipolar disorder and schizophrenia." M.R. displayed the same symptoms during his previous admission to NTSH earlier in 2015.

Like Dr. Syed, Dr. Shupe recommended inpatient treatment for M.R. and did not believe that a less restrictive treatment would be effective. He also did not think that outpatient treatment was an option at the time of trial because M.R. continued to exhibit symptoms and he had a recent change in his medication that he was getting used to. The side effects of the new medication made it "quite likely" that M.R. would not continue to take the medication when released. After M.R. was released from treatment in March 2015, he had stopped taking his medications and became severely ill after two weeks and had been readmitted to the hospital. Dr. Shupe believed that M.R. would quickly relapse if released and would have to be readmitted. Each relapse decreases a patient's chances of getting well. It was also Dr. Shupe's opinion that M.R. was unable to make a rational decision as to whether to submit to treatment.

Dr. Shupe also testified that M.R. had a history of using K2, a type of synthetic marijuana, which exacerbated M.R.'s psychosis. Dr. Shupe believed M.R. used K2 after his release from treatment in March 2015. According to Dr. Shupe, a person whose illness is not well controlled is more likely to use drugs in an attempt to escape the anxiety and agitation caused by the illness's symptoms.

Dr. Shupe did not believe that M.R. was likely to cause serious harm to himself or to others. He believed that M.R. was suffering from severe and abnormal distress and was experiencing a deterioration of his ability to function independently. Dr. Shupe also thought M.R. was unable to provide for his basic needs because he would go several days without showering and would only

13

shower when he was "strongly encouraged" to do so. Furthermore, M.R. did not have the wherewithal to provide for himself. On cross-examination, however, Dr. Shupe stated that M.R. had not had any issues with eating while at NTSH. Dr. Shupe further testified that the treatment for M.R.'s illness was likely to continue for more than ninety days, and M.R. had received court-ordered inpatient mental health services for at least sixty consecutive days in the preceding twelve months.

M.R.'s father, O.R., testified that he had a bachelor's degree in psychology and had worked as a director at a mental health facility and at a juvenile facility supervising counselors and administering medications to patients who were involuntarily committed. M.R. lived with him, M.R's mother, and M.R.'s siblings.

O.R. testified that M.R. only used K2 twice. The first time, he was "jumped" by some children who made him take it. M.R. had a seizure and was hospitalized. The second time, M.R. did not have a seizure but had a "very bad experience."

O.R. further testified that when M.R. was discharged from treatment in March 2015, M.R. was sent home with medication in a brown paper bag, but O.R. was not informed that M.R. had medication. O.R. thought the bag only contained clothes. Had O.R. known that M.R. had medication, he would have ensured that M.R. took it. O.R. testified that M.R. had the capability to provide food, clothing, shelter, and safety for himself at O.R.'s house and that O.R. and

M.R.'s mother could provide twenty-four-hour supervision of M.R. if he were to return home.

The jury found by clear and convincing evidence that M.R. had a mental illness and as a result of his mental illness, M.R. suffered from severe and abnormal mental, emotional, or physical distress; was experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety; and was unable to make a rational and informed decision as to whether or not to submit to treatment. The jury further found by clear and convincing evidence that M.R.'s condition was expected to continue for more than ninety days and that M.R. had received court-ordered inpatient mental health services under title 7, subtitle C of the health and safety code or chapter 46B of the code of criminal procedure for at least sixty consecutive days during the preceding twelve months. Based on the jury's findings, on July 6, 2015, the trial court ordered M.R. committed to NTSH for a period not to exceed twelve months. *See* Tex. Health & Safety Code Ann. § 574.035(a), (h) (West Supp. 2014). M.R. appealed. *See id.* § 574.070 (West 2010).

### *Post-commitment proceedings*

On September 3, 2015, upon a motion filed by Dr. Syed, the trial court modified the judgment to require M.R. to participate in outpatient mental health services. *See id.* § 574.061 (West Supp. 2014). M.R was released from

15

inpatient treatment but was required to participate in extended outpatient mental health services until July 6, 2016.

## Admission of M.R.'s Medical Records

In his first issue, M.R. argues that the Texas Rules of Evidence are in conflict with the statutory requirements of court-ordered mental health services pursuant to chapter 574 of the Texas Health and Safety Code, denying him due process, due course of law, and effective assistance of counsel. Specifically, M.R. complains that the statutory requirement that the hearing on an application for mental health must be held within fourteen days of the filing of the application conflicts with rule of evidence 902(10)(A) because the rule requires that business records be on file and notice served on the opposing party fourteen days prior to trial. *See* Tex. Health & Safety Code Ann. § 574.005(a); Tex. R. Evid. 902(10)(A). M.R. argues that this court's guidance is necessary to harmonize the statutory requirements of extended court-ordered mental health services with the fundamental requirements of due process, due course of law, and the right to effective assistance of counsel. But M.R. did not raise his constitutional complaints in the trial court; therefore, he did not preserve this issue for appellate review. *See* Tex. R. App. P. 33.1(a); *In re D.T.M.,* 932 S.W.2d 647, 652 (Tex. App.—Fort Worth 1996, no writ) ("Even constitutional arguments are waived at the appellate level if issues were not before the trial court."). Accordingly, we overrule M.R.'s first issue.

In his second issue, M.R. complains that the trial court improperly admitted his medical records into evidence because the State failed to lay the proper predicate under either rule of evidence 803(6) or 902(10). *See* Tex. R. Evid. 803(6), 902(10). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011); *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). "To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1); *Malone*, 972 S.W.2d at 43). In conducting this harm analysis, we review the entire record. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *Benavides*, 189 S.W.3d at 879. Evidentiary rulings do not usually cause reversible error unless an appellant can demonstrate that the judgment turns on the particular evidence that was admitted or excluded. *City of*

*Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995); *Benavides*, 189 S.W.3d at 879.

Properly authenticated records of a regularly conducted business activity can be admitted into evidence as an exception to the hearsay rule. Tex. R. Evid. 803(6). The foundation for admission may be established by the testimony of the custodian or other qualified witness or by an affidavit that complies with rule of evidence 902(10). *Id.* If an affidavit is used, a business record is self-authenticated, provided that the record to be introduced and the affidavit are served on the other party at least fourteen days before trial. Tex. R. Evid. 902(10)(A).

M.R. was committed pursuant to chapter 574 of the health and safety code. *See* Tex. Health & Safety Code Ann. §§ 574.001–.203 (West 2010 & Supp. 2014). Health and safety code section 574.031(e) provides that the rules of evidence apply to a hearing on an application for court-ordered mental health services unless the rules are inconsistent with the mental health code.[3] *See id.* § 574.031(e). M.R. and the State both assert that rule of evidence 902(10)(A) is inconsistent with the mental health code because the statutory deadlines for

---

[3]The mental health code includes chapters 571 through 579 of the health and safety code. *See* Tex. Health & Safety Code Ann. § 571.001 (West 2010).

18

holding a hearing on an application for mental health services conflicts with the fourteen-day deadline in rule 902(10)(A).[4]

We need not decide, however, whether rule 902(10)(A) is inconsistent with the mental health code or whether the trial court improperly admitted M.R.'s medical records because we conclude that any error in their admission was harmless. M.R. argues that he was harmed because the medical records, which included psychiatric evaluations, intervention notes, physician progress notes, nursing observation notes, and patient daily functioning checklists, went well beyond Dr. Syed's testimony.[5] M.R. specifically points to intervention progress notes dated April 17, 2015, which detailed a physical altercation between M.R. and a NTSH staff member during which M.R. had to be placed in a "vertical hold" and then into a "restraint chair." These notes list Dr. Syed as the attending

---

[4]Section 574.005 requires the judge or a designated magistrate to set the application for a hearing to be held within fourteen days after the date the application was filed. *See* Tex. Health & Safety Code Ann. § 574.005(a). The hearing may not be held during the first three days after the application was filed if the proposed patient or his attorney objects. *Id.* § 574.005(b). The court may grant one or more continuances of the hearing on a motion by a party and for good cause shown or on agreement of the parties, but the hearing cannot be held later than the thirtieth day after the date the application was filed. *Id.* § 574.005(c). However, the trial court may, by written order made each day, postpone the hearing for twenty-four hours if "extremely hazardous weather conditions exist or a disaster occurs that threatens the safety of the proposed patient or other essential parties to the hearing." *Id.*

[5]Citing *Washington National Insurance Co. v. Reed*, 462 S.W.2d 633 (Tex. Civ. App.—Waco 1971, no writ), M.R. alternatively contends that the harm analysis is unnecessary because the State failed to comply with the rules of evidence. *Reed* does not support this proposition. *See id.* at 634.

19

physician, which M.R. argues is contradictory to her trial testimony that she had been his treating physician for the past month. M.R. contends that a reasonably minded juror would have looked at the April 17, 2015 notes alone and concluded that the State had met its burden.

The April 17, 2015 notes were consistent with Dr. Syed's testimony that on two occasions in April 2015, M.R. had to be physically restrained because he had been physically aggressive towards NTSH staff. Moreover, the jury did not find that M.R. was likely to cause serious harm to others. Finally, as explained in our analysis below, even absent M.R.'s medical records, the evidence was legally sufficient to support the jury's findings challenged by M.R. on appeal. Thus, we find that admission of M.R.'s medical records was harmless, and we overrule M.R.'s second issue.

### Legal Sufficiency of the Evidence

In this third issue, M.R. argues that the State failed to establish by clear and convincing evidence that he was (1) suffering from severe and abnormal mental, emotional, or physical distress; (2) experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability to provide for his basic needs, including food, clothing, health, or safety; and (3) was unable to make a rational and informed decision as to whether or not to submit to treatment because the State failed to present evidence of a recent overt act or continuing pattern of behavior by M.R. that

20

tended to confirm his distress and the deterioration of his ability to function. *See id.* § 574.035(a)(2)(C)(i)–(iii), (e)(2) (West Supp. 2014).

***Extended Inpatient Mental Health Order***

A trial court may order a proposed patient to receive extended inpatient mental health services only if the factfinder finds from clear and convincing evidence that (1) the proposed patient is mentally ill; (2) as a result of that mental illness, he (A) is likely to cause serious harm to himself, (B) is likely to cause serious harm to others, or (C) is (i) suffering severe and abnormal mental, emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his ability to function independently, which is exhibited by his inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make a rational and informed decision as to whether or not to submit to treatment; (3) his condition is expected to continue for more than ninety days; and (4) he has received court-ordered inpatient mental health services under title 7, subtitle C of the health and safety code or chapter 46B of the code of criminal procedure for at least sixty consecutive days during the preceding twelve months. *Id.* § 574.035(a). Clear and convincing evidence is that "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

When court-ordered extended mental health services are sought under subsection (a), specific requirements for clear and convincing evidence are

21

imposed: the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function. Tex. Health & Safety Code Ann. § 574.035(e). An expert diagnosis of mental illness, without more, is not sufficient to confine a patient for compulsory treatment. *Mezick v. State*, 920 S.W.2d 427, 430 (Tex. App.—Houston [1st Dist.] 1996, no pet.). The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the expert opinion. *See id.* Moreover, the recent overt act or continuing pattern of behavior shown by the State must also relate to the criterion on which the judgment is based. *J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

### Standard of Review

To review the legal sufficiency of the evidence where the burden of proof is clear and convincing evidence, we consider all of the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we must disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.*

22

*Analysis*

M.R. only challenges the jury's findings that as a result of his mental illness, he was (1) suffering from severe and abnormal mental, emotional, or physical distress; (2) experiencing substantial mental or physical deterioration of his ability to function independently, which was exhibited by his inability to provide for his basic needs, including food, clothing, health, or safety; and (3) was unable to make a rational and informed decision as to whether or not to submit to treatment. *See* Tex. Health & Safety Code Ann. § 574.035(a)(2)(C)(i)–(iii). M.R. contends the State failed to present evidence of a recent overt act or continuing pattern of behavior by M.R. that tended to confirm his distress and the deterioration of his ability to function. *See id.* § 574.035(e)(2).

It is undisputed that M.R. suffers from schizoaffective disorder, a mental illness for which he requires medication. He suffers from hallucinations and has a history of responding aggressively to internal stimuli. Both Dr. Syed and Dr. Shupe testified that shortly after M.R. was released from inpatient treatment in March 2015, he stopped taking his medication and quickly relapsed. According to Dr. Syed, M.R. wandered away from his parents' house and was found two days later in a park, psychotic, responding to internal stimuli, and having defecated on himself. Even though M.R.'s condition had improved since his commitment, Dr. Syed and Dr. Shupe both testified that he still continued to exhibit symptoms of his disease and needed more time to adjust to medications. M.R.'s poor insight into his mental illness, his belief that he does not need

23

medication, and the side effects of his new medication made it likely that he would not continue his medication if released. Both Dr. Syed and Dr. Shupe testified that M.R. was unable to make a rational decision as to whether to submit to treatment. Even though M.R. had the capability to provide food, clothing, shelter, and safety for himself at his parents' house, he voluntarily left his parents' house and disappeared for two days. We conclude the testimony adduced at trial was some evidence of a continuing pattern of behavior by M.R. that tended to confirm his distress and the deterioration of his ability to function. *See id.* § 574.035(e)(2). Thus, the evidence was sufficient to produce in the mind of the jury a firm belief or conviction that as a result of his mental illness, that M.R. (1) was suffering from severe and abnormal mental, emotional, or physical distress; (2) was experiencing substantial mental or physical deterioration of his ability to function independently—which was exhibited by his inability to provide for his basic needs, including food, clothing, health, or safety—and (3) was unable to make a rational and informed decision as to whether or not to submit to treatment. *See id.* § 574.035(a)(2)(C)(i)–(iii). Accordingly, we overrule M.R.'s third issue.

**Conclusion**

Having overruled each of M.R.'s three issues, we affirm the trial court's judgment for court-ordered extended inpatient mental health services.

/s/ Anne Gardner
ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and GABRIEL, JJ.

DELIVERED:  November 3, 2015